UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CHRISTINA MARIE TRUMPOWER,

              Plaintiff,

      -vs-

CAROLYN COLVIN, Commissioner of
Social Security,

              Defendant.

**DECISION AND ORDER**
**No. 6:13-cv-6661(MAT)**

---

## I.   Introduction

Christina Marie Trumpower ("Plaintiff"), represented by counsel, commenced the instant action challenging the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"). The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).

## II.  Procedural History

On October 5, 2010, Plaintiff protectively filed an application for Title II benefits, alleging disability beginning September 17, 2010. The claim was initially denied on March 3, 2011. Plaintiff requested a hearing, which was held on May 30, 2012, in Rochester, New York, before Administrative Law Judge Connor O'Brien ("the ALJ"). Plaintiff appeared with her attorney and testified at the hearing, as did impartial vocational

expert Peter A. Manzi. The ALJ issued an unfavorable decision on September 25, 2012. T.7-20.[1] Plaintiff sought review from the Appeals Council, which was denied on November 5, 2013, making the ALJ's decision the final decision of the Commissioner. This timely action followed.

## III. Summary of the Administrative Transcript

### A.    Medical Records Considered by the ALJ

On February 5, 2006, Plaintiff began treating with her primary care physician, Valerie Newman, M.D., following a motor vehicle accident five days previously in which her car had been "t-boned" on the driver's side. T.444-45. The diagnosis was cervical strain and probable rib contusion.

Plaintiff treated on October 4, 2007, and November 30, 2007, with Dr. Richard Lewis at the University of Rochester Medical Center Department of Orthopaedics ("URMC"). T.278-80. Plaintiff had constant aching pain in buttocks region, pain pulling from the low back to the back of the heel upon range of motion, and occasional numbness in the base of the foot. T.280. Plaintiff's hip flexion and abduction was weakened secondary to pain. T.278.Straight leg raise was positive at 40 degrees. Dr. Lewis assessed probable sciatica and radiculitis. T.280. He prescribed Vicodin and ibuprofen for pain management.

---

[1]

Citations to "T." refer to pages in the certified copy of the administrative transcript, filed by the Commissioner in connection with her Answer to the Complaint.

On November 16, 2007, Plaintiff was treated by Dr. Newman for asthma, anxiety, and right leg sciatica with knee buckling. T.332-33. Examination revealed reproducible tenderness in the right SI joint region, exquisite tenderness to palpation, and positive straight leg raise. Dr. Newman prescribed Vicodin for pain. T.332.

Plaintiff was treated by Clifford Everett, M.D. on December 20, 2007, at URMC for low back and right leg pain. T.284-85. Plaintiff could only touch halfway between her ankles and knees. Her range of motion of the lumbar spine was abnormal with pain on extension and flexion. She had an active trigger point in the right side on palpation, and palpation over the sacral sulcus was pain provoking on the right. The diagnosis was lumbosacral neuritis. Dr. Everett recommended an MRI of the lumbar spine and referred Plaintiff to the rehabilitation division for further evaluation of her mild traumatic brain injury sustained during the motor vehicle accident.

On January 10, 2008, Plaintiff saw Dr. Everett regarding her continued lower back, right leg and buttock pain. T.289-90. Dr. Everett noted that she had tried and failed at least six weeks of conservative care for her back injury. Diagnoses were backache and myalgia/myositis.

On January 21, 2008, and February 29, 2008, Plaintiff saw Dr. Newman for right sciatica with knee buckling and chronic back pain. T.336-37, 338-39. Plaintiff was taking Cymbalta and Vicodin

-3-

and using Lidoderm patches, but was still suffering from severe pain. T.336. Plaintiff had full flexion, but painful spasm was induced upon standing. Dr. Newman noted that Plaintiff still was working as a nursing assistant but was avoiding "floor duty" with its heavier lifting requirements. On February 29, 2008, Dr. Newman stated that Plaintiff cannot work at her normal job, which Dr. Newman characterized as light work, because Plaintiff cannot perform the lifting requirements. T.338.

Plaintiff was treated by pain management specialist Nithyanandi Namassivaya, M.D. on March 15, 2008, for back and right hip pain. T.311. She had been off work and was using a TENS unit which provided temporary relief. Physical therapy had worsened her symptoms. Plaintiff had an antalgic gait, her pain was at a level 8 out of 10, her back range of motion was restricted, and she had tenderness in the right hip and right sacroiliac ("SI") joint regions. Dr. Namassivaya indicated Plaintiff had chronic low back pain, status post-motor vehicle accident, as well as right hip trochanteric bursitis. Plaintiff was able to return to her job as a certified nursing assistant but was precluded from prolonged standing and lifting greater than 20 pounds.

On April 21, 2008, and May 12, 2008, Plaintiff was treated by Dr. Newman for chronic back pain, with severe pain radiating in her right leg, and some soreness in her foot. T.342-43, 340-41. Plaintiff's back was positive for posterior tenderness and positive

for reproducible tenderness along her outer right buttock with radiation to her leg with palpation. Dr. Newman increased Plaintiff's dose of Cymbalta, and reinstated Vicodin for better pain control. Dr. Newman indicated Plaintiff was precluded from lifting greater than 20 pounds or standing for prolonged periods. She "remains partially disabled, released for return to four hours per day . . . may require additional limits." T.340.

Plaintiff saw Dr. Namassivaya on June 9, 2008, for back pain and right hip pain, localized to her right buttock and radiating down to her right knee and right leg. T.309. The pain was interfering with her sleep. Her range of motion in her back was restricted; and she had tenderness in the right hip region and right SI joint; and her pain was at a 10 out of 10. Straight leg raising was negative bilaterally. Dr. Namassivaya prescribed Ultram for pain control.

On June 10, 2008, July 8, 2008, August 7, 2008, and September 5, 2008, Plaintiff continued treatment with Dr. Newman for her chronic back pain. T.348-49; 354-55; 346-47; 358-59. Examination on July 8, 2008, revealed pain with palpation of the right SI joint region and surrounding area with some spasm, and Plaintiff reported limping at times with increased pain. T.354. On August 7, 2008, and September 5, 2008, Plaintiff reported persistent tenderness along the right SI region, and mild parasacral spasm worse with bending. T.346; 358. Standing for

-5-

extended periods of time caused pain in her lower back to travel into her leg. T.358.

Plaintiff was treated by Dr. Namassivaya on September 8, 2008, for right hip and low back pain and associated right hip weakness. T.308. She was taking a high dose of Cymbalta, Vicodin as needed, and Ultram, as well as using a TENS unit. However, these provided incomplete relief.

On October 10, 2008, and December 12, 2008, Plaintiff returned to see her primary care physician, Dr. Newman, for a mild flare of her lower back pain with increased radicular symptoms.  T.352-53; 356-57. She reported continued back pain traveling into her right leg. Examination was positive for posterior tenderness, soreness in the right SI joint, and positive straight leg raise. T.352, 356. Plaintiff reported her activity tolerance was limited. Dr. Newman indicated she agreed with Plaintiff's SSI application "given [Plaintiff's] inability to resume [the] level [of work] she has training for with retraining efforts recommended". T.357.

Plaintiff saw Dr. Namassivaya on January 7, 2009, for low back and right hip pain for which she was taking Cymbalta, Tramadol and Vicodin. T.307. Examination revealed pain upon spinal extension and side-bending bilaterally and tenderness to palpation at the right iliac joint and the right hip.

On January 20, 2009, T.379-80; March 13, 2009, T.362-63; May 19, 2009, T.373-74; and June 29, 2009, T.384-85, Plaintiff saw

Dr. Newman with regard to her chronic back pain. During this six-month period, Plaintiff consistently presented with low back tenderness along the right SI region and parasacral area, pain upon flexion and extension, and diffuse parasacral pain after prolonged positioning. T.371, 373, 384. Plaintiff was having good days and bad days; on bad days, she had difficulty getting up without severe spasms and pain. As a result, she had limited her activities in her home. T.362. Dr. Newman indicated Plaintiff may require disability if she is "unable to resume work with severe back pain flares limiting function". T.363. Plaintiff consistently needed Vicodin for pain control up to every four hours. T.374. Plaintiff indicated her back continued to intermittently flare on the left side with variable triggers, and she had flares even with modest bending. T.384.

On August 24, 2009, Plaintiff underwent a preventative medicine physical examination with Dr. Newman. T.375-78. Plaintiff had a new onset of borderline diabetes mellitus in addition to her chronic lower back pain, asthma, and anxiety. T. 377.

On August 25, 2009, Plaintiff saw Dr. Newman for continued, flaring back pain which extended to the top of back and neck. T.386-89. Examination revealed continued tenderness along the right side with spasm. At that time, Plaintiff's anxiety was controlled with Cymbalta, and her chronic back pain was "stable" and under "reasonable control". T.386.

Plaintiff was treated by Dr. Namassivaya on October 12, 2009, for chronic low back pain and right leg pain. T.306. She was taking Cymbalta and Tramadol for pain. Plaintiff had diminished strength in her right hip flexor secondary to pain and localized lower back tenderness. According to Dr. Namassivaya, Plaintiff had no work restrictions.

On October 20, 2009, November 17, 2009, November 23, 2009, January 12, 2010, and March 16, 2010, Plaintiff saw Dr. Newman for chronic back pain, diabetes mellitus, and hyperlipidemia. T.379-80; 390-91; 382-83; 395-96; 388-89. She mentioned the possibility of vocational retraining with VESID, possibly to become a phlebotomist. Dr. Newman's examinations in that period revealed right lateral parasacral area tenderness. Plaintiff reported flares of back pain with activities of daily living. Her pain was easily triggered by any lifting.

On April 5, 2010, Plaintiff saw Dr. Namassivaya for her chronic lower back pain. T.305. Plaintiff reported pain radiating to her hip, for which she was taking Tramadol, Vicodin, Ultram, and Neurontin. She also was taking Cymbalta for depression. Plaintiff's motor strength was diminished in her right hip and right hip flexor, secondary to chronic pain.

On April 29, 2010, Plaintiff saw Dr. Newman in follow-up for her chronic back pain. T.392-94. Examination revealed focal tenderness in right parasacral region but normal distal leg

-8-

strength and sensation. Plaintiff was to continue with Neurontin, Vicodin, and Ultram, and possible epidural injections from Dr. Namassivaya.

On May 17, 2010, Plaintiff saw Dr. Newman and reported continued lower back pain. T.407-09. She had paraspinal spasm of the right lower back. Flexion was intact but Plaintiff had spasms after repeated bending. T.408. Dr. Newman opined that Plaintiff was "fully disabled as [she is] unable to perform the work [for] which she has training. She was unable to fulfill the physical demands of a 'sedentary' job in 2008 at the Highlands and on this basis would be considered fully disabled. . . ." T.407. Dr. Newman stated, "She continues to be limited in ability to sit for prolonged periods of time at times of flare and with certain seated positions" and "also [has] some pain on prolonged sitting and walking." T.407. Further, Plaintiff was "very limited in her ability to repeatedly lift with variable triggering movement." Id. Plaintiff on some days had "severe limits" in activities of daily living. Id. Dr. Newman "agree[d] with her plan for additional schooling for light duty work, [and] disability if not approved for this retraining." Id.

On June 24, 2010, Plaintiff had an appointment with Dr. Newman regarding her chronic back pain, diabetes, and chronic anxiety. T.404-07. The pain was described as "an ache, burning and shooting" and was aggravated by bending, changing positions, and getting in and out of the car. Examination revealed that her spine was

positive for posterior tenderness but there were no neural deficits.

On August 12, 2010, Plaintiff was treated by Dr. Newman for a severe stress reaction. T.413-16. It had been triggered by Plaintiff's learning that her husband had been diagnosed with advanced stage cancer, closely following upon the death of her mother. Plaintiff presented as overwhelmed, very tearful, and distraught. She was having severe sleep disruption and an exacerbation of her lower back pain. Dr. Newman prescribed Xanax for Plaintiff's anxiety. Plaintiff declined a referral to counseling at that time.

On September 27, 2010, Plaintiff was treated by Dr. Newman for depression. T.418-21. Plaintiff reported anxious, fearful thoughts and a depressed mood. She was coping better with the Xanax, however. Dr. Newman stated that Plaintiff was "temporarily fully disabled, unable to take classes or work due to reactive depression [and] anxiety." T.420.

Plaintiff saw Dr. Namassivaya on October 4, 2010, for chronic low back pain. T.304. Plaintiff was taking Cymbalta, Ultram, and Vicodin. She reported she had been suffering from anxiety attacks for which Xanax had been prescribed, and that her primary care physician had placed her on disability.

On November 9, 2010, and December 27, 2010, Plaintiff returned to see Dr. Newman regarding her anxiety, depression, chronic lower

back pain, and chronic asthma. T.421-23; 426-28. Plaintiff was experiencing anxious, fearful thoughts; diminished interest in activities; anhedonia; fatigue/loss of energy; sleep disturbance; and tearfulness. Dr. Newman noted that Plaintiff's anxiety and grief reaction were "uncontrolled" and added Remeron to her drug regimen. Also, Plaintiff had an "incomplete antidepressant response to Cymbalta," despite using the maximum possible dosage. Dr. Newman prescribed Klonopin, with Xanax to be used as a "rescue" for breakthrough anxiety, and also expedited a referral to counseling. With regard to Plaintiff's back pain, she had posterior tenderness on her spine, with focal tenderness at L4 with supraspinous ligament prominence to posterior facet. She continued to require Vicodin every 4 hours for back pain.

On December 13, 2010, Plaintiff self-reported to the Genesee Mental Health Center, Behavioral Health Network for treatment of depressive symptoms. She met with Licensed Master Social Worker Patricia Wyjad ("LMSW Wyjad") for a pre-admission screen. T.464-65. Diagnoses were "Adjustment Disorder with Depressed Mood" and "Rule Out Depressive Disorder, Not Otherwise Specified." Plaintiff's GAF score was 55. LMSW Wyjadstated she was safe to remain in the community at current level of care, but she should continue to be monitored for further symptom exacerbation in light of her husband's terminal cancer.

On December 29, 2010, Plaintiff began one-on-one therapy with LMSW Wyjad. T.472, 542. Plaintiff was experiencing anticipatory grief stemming from her husband's recent cancer diagnosis, poor sleep, racing thoughts, negative ruminations, and crying.

On January 7, 2011, Plaintiff underwent a psychosocial assessment with LMSW Wyjad, T.466-70, as well as a counseling appointment, T.474, 543. Plaintiff was tearful throughout most of her session, and her mood was depressed. Plaintiff was experiencing symptom exacerbation, difficulty sleeping, and tumultuous emotions. Plaintiff exhibited racing thoughts, and her motor activity was somewhat restless. However, her insight and judgment were good. Diagnoses were "Adjustment Disorder with Depressed Mood" and "Rule Out Depressive Disorder, Not Otherwise Specified."

On January 14, 2011, Plaintiff saw Dr. Newman in follow-up for her chronic back pain, depression, and anxiety. T.666-67. She reported severe exacerbation of her lower back pain. She had increased aching pain with more radiation, muscle spasms, increased neck tightness, and localized right back and left hip pain. Dr. Newman increased the frequency of Vicodin from every 6 hours to every 4 hours.

On January 18, 2011, at her counseling appointment with LMSW Wyjad, T.544, Plaintiff's symptoms included crying, racing thoughts, low mood, and negative ruminations. She continued to

experience significant distress in regard to her husband's terminal cancer.

On January 20, 2011, Plaintiff saw Dr. Newman in follow-up for her chronic back pain, depression, and anxiety. T.668. Dr. Newman noted that Plaintiff's acute stress reaction and anxiety had improved with the addition of Klonopin and Remeron.

On February 1, 2011, Plaintiff attended counseling with LMSW Wyjad, T.545, reporting symptoms including crying, racing thoughts, low mood, and negative ruminations. She continued to experience significant distress and tumultuous emotions in regard to her husband's terminal cancer.

On February 11, 2011, Plaintiff returned to see LMSW Wyjad. T.546. She continued to experience significant negative ruminations, racing thoughts, tearfulness, sleep disturbance, and low mood. Plaintiff had significant anticipatory grief with depressive symptoms, and was tearful and overwhelmed.

On February 17, 2011, consultative physician Harbinder Toor, M.D. examined Plaintiff at the Commissioner's request. T.475-78. Plaintiff reported chronic pain in her lower back, which Plaintiff described as constant, sharp, at an intensity of 8 out of 10, and radiating to the right leg with tingling, numbness and pain in the right leg. She also had pain radiating to her upper back, right shoulder and neck. Plaintiff reported difficulty standing, walking, sitting, squatting, bending and lifting due to pain, as well as

difficulty twisting, bending, and extending the cervical spine. At that time her medications included Tramadol, Albuterol, ibuprofen, Symbicort, Flonase, Cymbalta, Remeron, Xanax, Klonopin, Vicodin. She also used a TENS unit for her chronic pain. On examination, Plaintiff was in moderate to severe pain in the back and right leg; her gait was abnormal, with a limp toward the right side; and she had difficulty getting out of the chair. T.476. Cervical spine flexion was limited to 20 degrees; extension to 0 degrees; lateral flexion to 20 degrees; and rotation to 20 degrees. T.477. Lumbar range of movement was limited, with forward flexion to 10 degrees; extension to 0 degrees; lateral flexion to 20 degrees; and rotation to 20 degrees. There was slight tenderness in her right leg. Dr. Toor diagnosed Plaintiff with a history of lower back injury, motor vehicle accident; history of lower back pain; history of cervical spine pain; history of pain in the right leg; history of balancing problem; history of depression; history of anxiety; history of stress; history of borderline diabetes; and a history of asthma. T.477-78. Her prognosis was "guarded". T.478. Dr. Toor opined Plaintiff had "moderate to severe limitation for standing, walking, squatting or heavy lifting" and "moderate limitation for sitting a long time." In addition, "[p]ain and balance [problems] interfere with her routine." Dr. Toor noted that Plaintiff should avoid irritants or other factors which can precipitate asthma." T.478.

Also on February 17, 2011, Plaintiff underwent a consultative examination with psychologist Kavitha Finnity, Ph.D. at the Commissioner's request. T.480-83. Plaintiff reported awakening frequently during the night, loss of appetite, dysphoric mood, crying, hopelessness, irritability, loss of interest, loss of energy, and social withdrawal. She also reported anxiety and acute stress. Plaintiff's affect was depressed, her mood was dysthymic, and her memory skills were mildly impaired as she could not recall three objects after five minutes. Dr. Finnity indicated Plaintiff was having trouble dealing with stress, and diagnosed her with major depressive disorder and anxiety disorder. Dr. Finnity opined that Plaintiff can follow and understand simple directions, perform simple tasks, maintain attention and concentration, maintain a regular schedule, learn new tasks and perform complex tasks, make appropriate decisions, and relate adequately with others. According to Dr. Finnity, Plaintiff's prognosis was fair to good. Dr. Finnity recommended continuation of psychiatric and psychological treatment.

Plaintiff saw LMSW Wyjad for counseling on February 21, 2011. T.547. Plaintiff continued to be tearful, with feelings of anticipatory grief, anxiety, low mood, racing thoughts, and negative ruminations. Plaintiff felt frustrated with her struggles to manage daily tasks.

On February 28, 2011, Plaintiff returned to see Dr. Newman for her chronic back pain, depression, and anxiety. T.675. Dr. Newman that Plaintiff had been experiencing an acute stress reaction and anxiety since September 27, 2010, and was still symptomatic. She presented at the appointment with a tearful and anxious affect.

On March 7, 2011, and March 17, 2011, Plaintiff saw LMSW Wyjad for counseling. T.548, 549. Plaintiff had low mood, anxiety, negative ruminations, racing thoughts, anger, tearfulness, and pressured speech. LMSW Wyjad noted that Plaintiff demonstrated the ability to use some coping mechanisms.

On March 22, 2011, Plaintiff reported to Dr. Newman that her chronic back pain was exacerbated by stress. T.684-86. Clinical findings with regard to Plaintiff's back were "unchanged" (posterior tenderness of spine and no paravertebral spasm). Percocet had not helped so Dr. Newman restarted Vicodin.

Plaintiff saw LMSW Wyjad on March 28, 2011. T.550. Plaintiff had low mood, anticipatory grief, racing thoughts, tearfulness, anger and crying. She continued to experience significant symptom exacerbation largely related to her husband's terminal cancer diagnosis.

On April 11, 2011, Plaintiff treated with LMSW Wyjad. T.551. Plaintiff had low mood, racing thoughts, and anxiety. She continued to grieve her mother's death and to have anticipatory grief for her husband.

Plaintiff treated with LMSW Wyjad on April 29, 2011. T.552. She was experiencing low mood, difficulty with focus, irritability, racing thoughts, and anxiety. Plaintiff was tearful during the appointment. Her husband's cancer had metastasized to his brain.

On May 9, 2011, Plaintiff returned to see LMSW Wyjad. T.553. Plaintiff was experiencing anhedonia, low mood, racing thoughts, and tumultuous emotions. However, Plaintiff's insight was good.

On May 10, 2011, Plaintiff saw Dr. Newman for her annual exam. T.697-98. Plaintiff reported an exacerbation of her chronic lower back pain and tenderness in her hip region.

On June 3, 2011, Plaintiff treated with Dr. Newman, who noted that Plaintiff's severe grief reaction had improved with Klonopin and Xanax. T.707. Plaintiff was tearful but had excellent insight and was using good coping strategies.

Also on June 3, 2011, Plaintiff attended counseling with LMSW Wyjad. T.554-55. Plaintiff had racing thoughts, anxiety, lack of appetite, irritability and low mood. She reported that her husband had died on May 18, 2011. Plaintiff continued to experience a conflicted relationship with her youngest daughter, which exacerbated her depression and anxiety. Although several risk factors were present, the lethality risk was low because Plaintiff denied suicidal ideation or plan, and had a support system.

On June 20, 2011, Plaintiff saw LMSW Wyjad for counseling. T.556. Plaintiff was experiencing racing thoughts, pressured

-17-

speech, anxiety, tearfulness, and low mood. Plaintiff exhibited good insight about the grieving process and was hopeful about starting VESID soon. She reported that she had a new dog; they went for walks together which was helpful to her.

On July 1, 2011, and July 11, 2011, Plaintiff saw LMSW Wyjad for counseling. T.558, 557. Plaintiff reported exacerbation of her depressive symptoms and increased instances of emotional dysregulation. Plaintiff had low mood, irritability, tumultuous emotions and racing thoughts. She reported that on June 26, 2011, she had decided to commit suicide by overdosing on prescription sleeping pills. However, she called a friend, who convinced her not to do it and was presently holding onto the sleeping pills. Finding that Plaintiff was at an acute risk psychiatrically, LMSW Wyjad completed a risk assessment on July 1, 2011. T.559. LMSW Wyjad stated that because Plaintiff had a plan to overdose on prescription sleeping pills, her risk of lethality was elevated to "moderate".

On August 10, 2011, Plaintiff saw LMSW Wyjad for counseling. T.560. Plaintiff continued to experience significant grief reaction. Her symptoms included racing thoughts, pressured speech, tearfulness, sleep disturbance, anxiety, restlessness, low mood, irritability and anger.

On August 16, 2011, Plaintiff returned to see Dr. Newman. T.719-20. Plaintiff reported that the rescue Xanax now was needed only occasionally for flares of her grief reaction.

On August 31, 2011, Plaintiff saw LMSW Wyjad. T.561. Plaintiff was experiencing exacerbation of symptoms (tearfulness, racing thoughts, anxiety, irritability, isolative grief reaction, sleep disturbance). Plaintiff was considering starting school but was apprehensive due to current difficulties managing appointments and other obligations.

On September 19, 2011, Plaintiff saw LMSW Wyjad and reported exacerbation of symptoms (racing thoughts, tearfulness, low mood, irritability, anger, low motivation) due to grief. T.562. Plaintiff was receptive to counseling.

On October 6, 2011, Plaintiff treated with LMSW Wyjad. T.563. Plaintiff was experiencing tearfulness, negative ruminations, low mood, racing thoughts, anxiety, and sleep disturbance. Plaintiff presented with low mood and tearfulness and reported ongoing grief and feelings of guilt.

Also on October 6, 2011, Plaintiff was treated by Dr. Newman for severe exacerbation of her lower back pain, anxiety, stress, depression, anxiety, and grief.  T.730. Dr. Newman indicated that Plaintiff was having an "overwhelming" grief reaction and was very tearful. Dr. Newman diagnosed a severe exacerbation of Plaintiff's grief reaction and noted that her anxiety was "uncontrolled".

Concerning Plaintiff's back pain, she had increased aching with more radiating pain, muscle spasms, increased neck tightness, and localized right back and left hip pain. T.666, 738. Examination revealed Plaintiff's spine was positive for posterior tenderness and paravertebral muscle spasm; she had muscle spasm in the trapezius region; paraspinal soreness; and tenderness with right straight leg raise. T.739-40. Plaintiff's husband's terminal illness was triggering memories of her mother's death. T.689. She was experiencing anxiety, fearful thoughts, depressed mood and extremely high situational stressors, overwhelming stress levels even with counseling and medication in place. T.668, 675.

Plaintiff treated with LMSW Wyjad on October 25, 2011. T.564. Plaintiff reported sleep disturbance, loss of appetite, anger, irritability, crying, low mood and negative ruminations. Symptoms had worsened during the past month. Plaintiff stated, "Sometimes I break down crying or my mind drifts." Plaintiff was encouraged to join a bereavement support group.

Plaintiff returned to see LMSW Wyjad on November 2, 2011, accompanied by youngest daughter and granddaughter. T.565. Plaintiff was experiencing pressured speech, racing thoughts, low mood, anxiety, and ruminations. LMSW Wyjad facilitated discussion between Plaintiff and her daughter regarding their troubled relationship.

On November 10, 2011, Plaintiff saw psychiatrist Gregory L. Seeger, M.D. at Genesee Mental Health for a medication review. T.566-67. Dr. Seeger noted that Plaintiff continued to have depressive symptoms despite being on the maximum dosage of Cymbalta, as well as Remeron and Klonopin. She was crying all the time, had poor sleep, and lacked motivation to engage in activities. At the appointment, Plaintiff was quite tearful and sad, but was not suicidal or psychotic. Her judgment appeared good. Dr. Seeger diagnosed Plaintiff with major depressive disorder, moderate severity. Wellbutrin was added to her medication regimen.

On November 28, 2011, Plaintiff treated with LMSW Wyjad, T.568, and reported tearfulness, negative ruminations, anxiety, pressured speech, low mood and racing thoughts. She presented with mood lability and was tearful discussing her continued grief.

Plaintiff returned to see LMSW Wyjad on December 12, 2011. T.569. She reported a decrease in vacillating moods but presented tearfully and expressed ongoing grief. She was receptive to therapy but her insight varied.

**B.  Additional Records Submitted to Appeals Council**

Plaintiff saw LMSW Wyjad for counseling on January 16, 2012. T.770. She was experiencing sleep disturbance, crying, anger, irritability, negative ruminations, low mood, anxiety and racing thoughts. She presented as tearful and reported that her significant other might have cancer.

On February 8, 2012, Plaintiff saw R.N. Alyse Marks at Genesee Mental Health for medication management. T.771-74. Plaintiff was tearful, anxious, depressed, and having negative ruminations.

On February 9, 2012, Plaintiff had a counseling appointment with LMSW Wyjad. T.775. She reported increased episodes of emotional dysregulation and anger outbursts. Plaintiff was resistant to active coping but eventually identified oldest daughter as a support.

On February 27, 2012, Plaintiff treated with LMSW Wyjad. T.776. She reported tearfulness, racing thoughts, negative ruminations, sleep disturbance, paranoia, and low mood. She presented as tearful and indicated significant distress due to granddaughter's having contracted MRSA. During the appointment, Plaintiff began to exhibit paranoia, anxiety, and possible delusional thoughts, and LMSW Wyjad provided crisis intervention and completed a risk assessment. T.777-78. Plaintiff expressed a belief that "the government" was deliberately harming citizens to reduce the population to 500,000, and that she needed to keep herself and her family "safe". Plaintiff's granddaughter had contracted MRSA, which is what Plaintiff believed "caused" her mother's death. Plaintiff was "preoccupied" with thoughts that "the government and medical field" would withhold treatment from her ill granddaughter in furtherance of their plan to reduce the

population. She also had fears that her deceased husband was "trying to take her [granddaughter]." T.776.

On March 5, 2012, Plaintiff treated with LMSW Wyjad, and presented as tearful with a depressed affect. T.779. She continued to be preoccupied with losses and was significantly fearful that someone else close to her was going to die soon. LMSW Wyjad stated that Plaintiff "does not present with delusions but cites a superstition about pictures falling off the wall as an indication of upcoming death." T.779.

Also on March 5, 2012, Plaintiff saw Dr. Seeger, to whom LMSW Wyjad had reported Plaintiff's possible psychotic symptoms. T.781-82. Dr. Seeger noted that Plaintiff "has been paranoid about pictures of family members falling of the wall and then [the family members] passing away," and that her mood "has been quite changeable and unstable as of late." T.781. Although she was taking three antidepressants, she was "still quite depressed." Id. Dr. Seeger discontinued Cymbalta, began a trial of Risperdal, and continued Wellbutrin and Klonopin. In his opinion, she was not suicidal but had reported some psychotic symptoms. The diagnosis was major depressive disorder, recurrent, with psychotic features.

On March 12, 2012, Plaintiff presented to LMSW Wyjad as slightly agitated and in distress following a physical altercation with her daughter, who had a history of aggression and angry outbursts. T.783. Plaintiff told LMSW Wyjad that she "would hurt

her daughter and 'maybe kill' her if [her daughter] attacked her again." T.783, 784. Based on these statements, LMSW Wyjad completed a risk assessment. T.784. Plaintiff denied any access to weapons or intention of harm and was receptive to a safety plan.

On March 29, 2012, Plaintiff returned to see LMSW Wyjad, T.785, reporting a low mood, racing thoughts, increased tearfulness, and ruminations. Plaintiff reported difficulty applying coping strategies and recognized her "high energy" was a barrier. Plaintiff was frustrated that she could not restart school as yet.

On April 30, 2012, Plaintiff was treated for back pain by orthopedist John Dickinson, M.D. T.788-89. She was tearful and sad throughout the appointment, and talked about all of the difficult things in her life. Her back hurt on both sides with pain radiating down the lateral right leg with numbness in her toes. T.788. At that time, she was taking Tramadol, Vicodin, Klonopin, Wellbutrin, Risperdal and Naproxen. On examination, Plaintiff had an abnormal gait, was unable to squat, had pain in her hips bilaterally, and had back pain with straight leg raising. T.789. Dr. Dickinson diagnosed Plaintiff with chronic lumbar pain, discontinued Vicodin, and prescribed physical therapy.

On May 3, 2012, LMSW Wyjad wrote a letter "to whom it may concern" indicating that she could not complete "your questionnaire in detail as we do not focus on specific work readiness and

assessing the client's employability." T.790. She indicated Plaintiff had been diagnosed with Major Depressive Disorder, Recurrent with Psychotic Features and that her GAF was 57.

On June 29, 2012, LMSW Wyjad completed a Monroe County Department of Human Services form titled, Psychological Assessment For Determination Of Employability. T.793-96. Plaintiff's chief complaints were low mood, racing thoughts, anxiety, emotional dysregulation, pressured speech, negative ruminations, irritability and sleep disturbance. Under the section "Episodes Attributed To Psychiatric Complaints," LMSW Wyjad checked the box "never" with regard to emergency room visits, acute psychiatric hospitalization, interacts appropriately with others, prior attempts at alcohol/drug abstinences,[2] passing out or black-out episodes, repetitive violent actions toward self or others, behavior interferes with activities of daily living, suicide attempt and "decompensation (episodes of psychosis)". T.794. She checked the box "on occasion" with regard to "loss of job or failure to complete education or training program." T.794. LMSW Wyjad indicated that Plaintiff was moderately limited, defined as unable to function 10% to 25% of the time in regards to the following: understanding and remembering simple instructions and directions; performing simple and complex tasks independently; maintaining attention and concentration for rote

---

[2]

The wording of the form is confusing, and therefore the Court wishes to point out that there is no evidence that Plaintiff ever used or abused alcohol or controlled substances.

tasks; regularly attending to a routine and maintaining a schedule; and performing low stress and simple tasks. Plaintiff had no evidence of limitation with regard to maintaining basic standards of hygiene and grooming. LMSW Wyjad opined that Plaintiff was "unable to participate in any activities except treatment or rehabilitation" for an "unknown" duration. T.795. She stated that Plaintiff's "current emotional dysregulation and anxiety interfere w[ith] ability to work." T.796.

### B.    Plaintiff's Hearing Testimony

At the hearing, Plaintiff immediately became tearful upon mention of her husband's death. T.41. She testified, "My head is not together. It's a mess. I can't remember things; I can't focus." T.46. Plaintiff related that she had been in a car accident and had suffered from back pain since then. T.51. She was only taking Naproxen and ibuprofen for pain, because her physical therapist believed she was on too many drugs, due to her anti-psychotic medications. T.51. The Naproxen and ibuprofen did not help her back pain, which was in her entire lower back and down both legs. Currently, she was taking Risperdal, Mirtazapin, Clozapin, Wellbutrin, and Haldol. T.52. However, these drugs did not seem to help because she continued to have crying spells and "have a roller coaster ride. . . ." T.54. She was getting treating for her depression with Dr. Seeger and LMSW Wyjad. She explained that she cried all the time, she forgot things and could not focus, had a

variable mood, her head was "just not right", and she suffered from "rages". Plaintiff testified that her depression had begun to manifest with psychotic features, including "seeing" and "hearing" her deceased mother. With regard to her activities, Plaintiff attempted to clean her house but could only do a little bit at a time. T.57. She had tried to do some planting in her yard, but this caused back pain for three days after. She estimated that she could walk for 15 minutes, sit for 10 to 15 minutes, and lift no more than 10 pounds.

**III. The ALJ's Decision**

The ALJ adhered to the Commissioner's five-step sequential evaluation process for evaluating applications for adult disability benefits. See 20 C.F.R. § 404.1520. At step one, the ALJ found that Plaintiff met the insured status requirements of the Act through December 31, 2013, and that Plaintiff had not engaged in substantial gainful activity since September 17, 2010.

At step two, the ALJ determined that Plaintiff has the following "severe impairments: sciatica; asthma; allergies; depression; and diabetes" because they "cause more than minimal limitations in the claimant's ability to perform basic work activities. . . ." At step three, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ

specifically considered Listing 12.04 (Affective Disorders) and found that Plaintiff does not satisfy the "paragraph B" criteria, since she does not have "marked" limitations in any of the pertinent areas of functioning. Rather, the ALJ found, Plaintiff has mild restriction in activities of daily living, moderate difficulties in social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation of extended duration.

At step four, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform sedentary work with the following limitations: she requires a sit/stand opinion that allows her to change position every 60 minutes, for up to 10 minutes; she can never climb ropes, ladders, or scaffolds; she can only occasionally climb stairs or ramps, stoop, bend to the floor, kneel, crawl, and crouch; she can occasionally reach overhead bilaterally; she can occasionally tolerate exposure to extreme heat/cold, wetness, humidity, and airborne irritants; she will require up to three additional less-than-five-minute breaks throughout the day; she requires a lower stress environment, i.e., only occasional changes in work setting, no highly time-dependent "production assembly line" pace, no interaction with the public, and only occasional interaction with co-workers, and no teamwork or tandem work. In light of the foregoing RFC, the ALJ concluded that

Plaintiff cannot perform any of her past relevant work a home health aide, certified nursing assistant, and office helper.

At step five, the ALJ relied on the testimony of the VE to find that there are jobs in the national economy that can be performed by an individual of Plaintiff's age and with her education, work experience, and RFC. The ALJ further found that Plaintiff was capable of making a successful adjustment from her past relevant work to other work that exists in significant numbers in the national economy, and therefore she has not been under a disability from September 17, 2010, through September 12, 2012, the date of the decision.

## IV.  Standard of Review

Title 42 U.S.C., § 405(g) authorizes district courts "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." This Court's function is not to determine de novo whether a claimant is disabled, Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (citation omitted), but rather to evaluate whether the Commissioner applied the correct legal standard in making the determination and, if so, whether such determination is supported by substantial evidence in the record. E.g., Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g); Bubnis v. Apfel, 150 F.3d 177, 181 (2d Cir. 1998)).

A deferential standard does not apply to the Commissioner's application of the law, however, and this Court independently must determine if the Commissioner applied the correct legal standards in arriving at her decision. See Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984) ("Failure to apply the correct legal standards is grounds for reversal."). Therefore, this Court first reviews the Commissioner's application of the pertinent legal standards, and, if the standards were correctly applied, then considers the substantiality of the evidence. See Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987) (stating that "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles").

## V.   Discussion

### A.   Failure to Properly Evaluate Opinions By Acceptable Medical Sources

Plaintiff argues that the ALJ failed to properly evaluate opinions by several acceptable medical sources, including those of Plaintiff's treating physician Dr. Newman and consultative physician Dr. Toor. Plaintiff argues that these errors were not harmless because both opinions suggest greater limitations than those set forth in the ALJ's RFC.

### 1.   Treating Physician Dr. Newman

Plaintiff began treatment with Dr. Newman, her primary care physician, in 2006, and continued treating with her through 2011. T.444; 738. The medical records reflect nearly 40 appointments with Dr. Newman in that time period. "Whether the 'treating physician' rule is appropriately applied depends on 'the nature of the ongoing physician-treatment relationship." Arnone v. Bowen, 882 F.2d 34, 41 (2d Cir. 1989) (quoting Schisler v. Heckler, 851 F.2d 43, 45 (2d Cir. 1988)). Based on the foregoing treatment record, Dr. Newman qualifies as a "treating physician".

The applicable regulations provide that ALJs are obligated to "evaluate every medical opinion [they] receive". 20 C.F.R. § 404.1527(c). Unless an ALJ gives controlling weight to a treating source opinion, she is required to consider a number of factors in deciding the weight to be accorded to the treating source. 20 C.F.R. § 404.1527(c). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). Furthermore, "[a]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008) (citing Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999)).

On September 27, 2010, Dr. Newman stated that Plaintiff was "fully disabled and unable to work/return to school" due to stress reaction with reactive depression and anxiety; Dr. Newman anticipated that this disability would last for six months. T.420. The ALJ assigned "little weight" to this opinion, because "Dr. Newman is not a psychiatrist"; "his [sic] opinion is conclusory and does not provide a function-by-function analysis of the claimant's abilities"; "it is not clear whether Dr. Newman is ruling out only the claimant's past work or all work"; and "the opinion is note [sic] supported by the treatment notes", which indicate that the same day the opinion was rendered, Plaintiff "reported her depression was improved and the medication was helpful[.]"

Courts in this Circuit and elsewhere have found that an ALJ's duty to develop the record is triggered where a treating physician opines a claimant is under a disability, without identifying, with sufficient specificity, the objective findings that support this opinion. E.g., Mecklenburg v. Astrue, No. 07-cv-760, 2009 WL 4042939, at *9 (W.D.N.Y. Nov. 19, 2009); see also Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004). That is what occurred in the present case, where the ALJ rejected Dr. Newman's opinion in large part because the ALJ found that it was incomplete. In such case, the ALJ had a duty to develop the record by re-contacting Dr. Newman for clarification regarding any questions

she had concerning the scope of, and foundation for, Dr. Newmans's September 27, 2010 opinion. Because the ALJ failed to do so, remand is required.

### 2. Consultative Physician Dr. Toor

Plaintiff argues that the ALJ's failed to properly weigh the opinion provided by consultative physician Dr. Toor, who opined that Plaintiff has "moderate to severe" limitations for standing, walking, squatting or heavy lifting; and a "moderate" limitation for sitting "a long time". T.478. The ALJ accorded "some weight" to Dr. Toor's opinion, but found "that the severity of the limitations for standing and walking are not supported by the examination findings or the medical evidence of record." However, orthopedist Dr. Dickinson noted clinical findings that were consistent with Dr. Toor's assessment, namely, that Plaintiff was unable to squat, had pain in both hips, and had back pain upon straight leg raising.

### B. Failure to Account for the Severity of Plaintiff's Depressive Disorder

As noted above, the ALJ found at step two that Plaintiff suffered from, inter alia, the "severe impairment" of "depression". Plaintiff argues that the ALJ "persistently minimized and mischaracterized the severity of Plaintiff's depressive disorder" throughout her decision, leading to an inaccurate RFC assessment.

As an initial matter, the Court finds that the ALJ erred by failing to accurately characterize Plaintiff's affective disorder at step two of the sequential evaluation. The ALJ found that

Plaintiff had the severe impairment of "depression". Most recently, however, Plaintiff had been diagnosed with major depressive disorder, recurrent with psychotic features. Major depressive disorder without psychosis is a separate diagnosis from major depressive disorder with psychotic features; it is a different illness with different risk factors, and it entails different treatment.[3]

Furthermore, the ALJ consistently mischaracterized the severity of Plaintiff's major depressive disorder throughout the remainder of her decision. Courts in this Circuit have found reversible error where an ALJ arrives at an RFC assessment in reliance on a mischaracterization or misstatement of the record. See, e.g., Lugo v. Chater, 932 F. Supp. 497, 503 (S.D.N.Y. 1996) (ALJ erred by mischaracterizing claimant's testimony; ALJ bolstered his skepticism about claimant's reports of pain by observing that claimant had testified that he "does housework and uses public transportation"; however, district court found, ALJ's statement in this regard was "simply wrong" because claimant testified that he did not do housework and was unable to take public transportation by himself because of his vision); Richardson v. Barnhart, 443 F. Supp.2d 411 (W.D.N.Y. 2006) (similar).

The ALJ here concluded that Plaintiff "recovers [from her depression and anxiety] with treatment and is overall responsive to

---

[3]     See "Psychotic Depression", National Institute of Mental Health, located online at http://psychcentral.com/lib/psychotic-depression/0001291.

care." T.17. However, recent records indicate that Plaintiff's
depression has become more resistant to treatment. In August 2010,
Plaintiff began receiving mental health treatment from her primary
care physician, Dr. Newman, who eventually referred Plaintiff to
Genesee Mental Health in December 2010. There, Plaintiff received
regular and frequent one-on-one counseling with LMSW Wyjad and
psychiatrist Dr. Seeger. Over the course of about two years,
Plaintiff's doctors have prescribed numerous drugs to combat her
anxiety and depression: Xanax, Cymbalta, Remeron, Klonopin,
Wellbutrin, Risperdal,[4] and Haldol.[5] The nature of Plaintiff's
depression has changed, as evidenced by her different diagnoses
over time. In November 2011, Dr. Seeger diagnosed Plaintiff with
major depressive disorder, moderate severity. T.566. In March 2012,
however, Dr. Seeger diagnosed Plaintiff with recurrent major
depressive disorder, with newly present psychotic features. T.781.
At that time, Dr. Seeger observed that Plaintiff was on three
antidepressants but was "still quite depressed." T.781. The ALJ,
however, concluded that Plaintiff's depression was not that severe
because it allegedly "responded to treatment." T.18. Not only does

---

[4]

Risperdal is an atypical antipsychotic and is generally prescribed to treat
the symptoms of schizophrenia in adults and teenagers 13 years of age or older,
and episodes of mania or mixed episodes (symptoms of mania and depression that
happen together). See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694015.html

[5]

Haldol is in the class of conventional antipsychotic drugs and is generally
used to treat psychotic disorders and motor tics.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682180.html

this contradict treating psychiatrist Dr. Seeger's assessment, even Dr. Newman earlier had found that Plaintiff had an "incomplete antidepressant response" to Cymbalta. That conclusion also ignores the longitudinal medical record, which depicts an individual whose depression has worsened over time and become more complex.

The ALJ also concluded, contrary to the record evidence, that Plaintiff "did not exhibit delusional thought patterns or psychosis." T.17. This statement fails to account for Dr. Seeger's diagnosis of major depression with psychotic features and ignores evidence in the records summarizing Plaintiff's psychiatric treatment, such as the repeated necessity of crisis intervention by LMSW Wyjad. The ALJ never directly addresses Plaintiff's diagnosis of major depressive disorder with psychotic features, instead euphemistically referring to her delusional thoughts about a government-sponsored policy to cull the population by withholding medical treatment as "some degree of magical reasoning and stress." However, LMSW Wyjad, a mental health professional, found such thoughts significant enough to require crisis intervention.

LMSW Wyjad provided other instances of crisis intervention, such as when Plaintiff was at an acute risk of suicide based on an articulated plan to overdose on prescription sleeping pills in June 2011. See T.449. LMSW Wyjad completed a risk assessment in February 2012, when Plaintiff stated that "[she]'d kill us all if" she "knew the end was coming." T.778. LMSW Wyjad characterized this

apocalyptic threat as "vague" because Plaintiff did not have a specific plan, but still found it necessary to complete a risk assessment form. In March 2012, LMSW Wyjad provided crisis intervention again after finding that Plaintiff was at an acute risk of harming others based on her stated threats, during a therapy session, to kill her daughter if her daughter ever threatened her with physical harm again. T.784. The ALJ minimized the seriousness of these incidents, characterizing them as "vague thoughts [by Plaintiff] of harming herself and others." T.17.

It also appears to the Court that the ALJ cherry-picked evidence from the record to support her finding that Plaintiff's depression and anxiety were not that severe. For instance, in the step three analysis of Listing 12.04 (Affective Disorders), the ALJ found that Plaintiff has only "moderate" difficulties in maintaining concentration, persistence or pace, noting that "[a]t the *time of application*," Plaintiff "stated she has no problems paying attention and can follow both spoken and written instructions" and "is able to pay bills . . . ." T.13 At the subsequent hearing, however, when asked how she was paying her bills, Plaintiff responded, "I don't know. I thought I was on Workmen's Comp or whatever . . . . And they-see, I'm forgetting things. Oh, God." T.45. Plaintiff never was able to answer the question of how she was paying her bills. In addition, at counseling appointments, LMSW Wyjad consistently noted that

Plaintiff was experiencing racing thoughts, tumultuous emotions, negative ruminations, and pressured speech, all of which would affect Plaintiff's ability to maintain concentration, persistence and pace. Thus, it appears that the ALJ selectively parsed the record for evidence that Plaintiff had no issues with concentration, persistence and pace, while ignoring more recent evidence indicating that she does have significant problems in this area.

Similarly, with regard to social functioning, the ALJ cherry-picked evidence from the record. The ALJ found that Plaintiff only has "moderate difficulties" in social functioning. T.13. Although the ALJ acknowledged that Plaintiff testified that she has "periods of 'raging mania'", the ALJ weighed more heavily Plaintiff's statements, made *at the time of application*, that she "has no problems getting along with others or respecting figures of authority", and she visits her daughter and sisters at their home. T.13. However, the ALJ ignored objective evidence in the record that Plaintiff's ability to behave in an emotionally stable and appropriate-to-context manner has decreased since the time of her application. For instance, Plaintiff started crying in front of the ALJ immediately upon the mention of her deceased husband. At a visit with her orthopedist nearly a year after her husband's death, Plaintiff was tearful throughout the appointment and talked constantly about all of the difficult things in her life. Plaintiff

required crisis intervention after she got into a physical altercation with her youngest daughter, and threatened to hurt her or possibly kill her if she ever felt threatened by her daughter again. It was improper for the ALJ to discount more recent, objective evidence showing that Plaintiff's functional ability in this area has deteriorated significantly due to her anxiety and major depression with psychotic features.

While an ALJ is entitled to resolve conflicts in the evidentiary record, she "cannot pick and choose evidence that supports a particular conclusion." Smith v. Bowen, 687 F. Supp. 902, 904 (S.D.N.Y. 1988) (citing Fiorello v. Heckler, 725 F.2d 174, 175–76 (2d Cir. 1983); Ceballeros v. Bowen, 649 F. Supp. 693, 700 (S.D.N.Y. 1986). Such "cherry-picking" of evidence is improper. See, e.g., Correale-Englehart v. Astrue, 687 F. Supp.2d 396, 439 (S.D.N.Y. 2009) (reversible error where "the ALJ cherry-picked some of the findings of the [doctor]—notably those that minimized plaintiff's . . . limitations—and ignored others").

### C. Lack of Substantial Evidence to Support the RFC Assessment

Plaintiff argues that the RFC assessment finding that she can perform sedentary work with a sit/stand option is not supported by substantial evidence because it is unclear from the ALJ's decision what medical evidence was relied upon in arriving at this RFC. Additionally, the ALJ failed to perform a function-by-function assessment of Plaintiff's ability to perform the individual work-

related activities involved in sedentary work. Instead, the ALJ summarily concluded that Plaintiff has the RFC to perform sedentary work with various restrictions, chiefly, a "sit/stand option that allows her to change position every 60 minutes for up to 10 minutes." However, this statement does not identify how long Plaintiff is able to sit or stand, either at one time or in total during an eight-hour workday. Thus, it is not clear how the ALJ arrived at the conclusion that Plaintiff could perform—even with a sit/stand option—the exertional requirements for most sedentary jobs, i.e., at least 6 hours of sitting and at least 2 hours of standing/walking, respectively, in an 8-hour work day.

Moreover, the most specific assessment offered in this regard by an acceptable medical source, consultative physician Dr. Toor,[6] suggests that Plaintiff could not sit or stand or walk for those lengths of time. See Wojciechowski, 967 F. Supp.2d at 611 (opinion by treating physician that claimant could not sit for at least 6 hours in an 8-hour workday was "generally consistent" with the opinion of consultative examiner, who opined that claimant had a "moderate limitation for prolonged siting"). "[I]f Plaintiff cannot sit for six hours in an eight-hour workday, her ability to perform sedentary work has been eroded." Id. at 608 (finding reversible error where "[t]he ALJ did not make a specific finding regarding

---

[6]
    As noted above, Dr. Toor found moderate to severe limitations in standing and walking, and a moderate limitation in sitting for a long time. T.478.

how long Plaintiff could sit during an 8-hour workday"; although ALJ "did find that Plaintiff could need to sit or stand alternatively without leaving her work station, . . . it is not clear how he arrived at this conclusion").

## VI.  Remedy

"Sentence four of Section 405(g) provides district courts with the authority to affirm, reverse, or modify a decision of the Commissioner 'with or without remanding the case for a rehearing.'" Butts v. Barnhart, 388 F.3d 377, 385 (2d Cir. 2002) (quoting 42 U.S.C. § 405(g)).  The standard for directing a remand for calculation of benefits is met when the record persuasively demonstrates the claimant's disability, Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980), and where there is no reason to conclude that the additional evidence might support the Commissioner's claim that the claimant is not disabled, Butts v. Barnhart, 388 F.3d 377, 385-86 (2d Cir. 2004).

After reviewing the entire record, the Court finds that it already has been developed fully for the relevant period. Furthermore, the Court finds that the record contains persuasive proof of Plaintiff's disability, even without considering the evidence submitted post-hearing to the Appeals Council. LMSW Wyjad's post-hearing opinions concerning the functional limitations caused by Plaintiff's severe mental impairments provide additional compelling evidence of Plaintiff's disability.

-41-

The Court is cognizant that LMSW Wyjad is an "other source" under the regulations. While an "other source" opinion generally is not treated with the same deference as a treating physician's opinion, consideration of an opinion from someone who is not an "acceptable medical source" is particularly important where that provider is the "sole source that had a regular treatment relationship with plaintiff." White v. Commissioner of Soc. Sec., 302 F. Supp.2d 170, 176 (W.D.N.Y. 2004) (citation omitted). Here, LMSW Wyjad is a specialist in the mental health field, and she had a long-term treating relationship with Plaintiff. Her assessment is consistent with the treatment notes of Dr. Seeger, the psychiatrist with whom she consulted on Plaintiff's case. LMSW Wyjad's opinion, based on numerous face-to-face visits with Plaintiff over a long period of time, is entitled to greater weight than that of consultative psychologist Dr. Finnity, who only examined Plaintiff once, much earlier on in the disability application process. See SSR 06-03p, 2006 WL 2329939, at *2 ("depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source' "such as when the "other source" "has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion"). Applying the correct legal standards to all

-42-

of the relevant evidence compels the conclusion that Plaintiff's combination of physical and mental impairments are disabling under the regulations. Accordingly, the Court finds that a remand for further administrative proceedings to correct the above-discussed errors would serve no purpose, and remand for the calculation of benefits is warranted. <u>See</u>, <u>e.g.</u>, <u>Muntz v. Astrue</u>, 540 F. Supp.2d 411, 421 (W.D.N.Y. 2008).

## VII. Conclusion

For the foregoing reasons, the decision of the Commissioner is reversed, and the Commissioner's motion for judgment on the pleadings is denied. Plaintiff's motion for judgment on the pleadings is granted, and the matter is remanded to the Commissioner solely for calculation and payment of benefits.

**SO ORDERED.**

S/Michael A. Telesca

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    January 13, 2015
          Rochester, New York